USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/31/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
PHOENIX ENTERTAINMENT PARTNERS,
LLC,

                  Plaintiff,

      -against-

J-V SUCCESSORS, INC., *d/b/a Keats, a/k/a Keats Bar*,

                  Defendant.
-----------------------------------------------------------------X

1:16-cv-9451-GHW

OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

    Sore throats. Ringing ears. Embarrassed friends. The longest version of Bohemian Rhapsody, ever. These perils of karaoke are widely known. Keats Bar on Second Avenue is facing a lesser known peril of the industry: a trademark infringement and unfair competition lawsuit in federal court. Plaintiff alleges that the use of copied versions of its karaoke accompaniment tracks violates its trademarks and service marks, and is pursuing these claims as trademark rather than copyright claims because it does not own the relevant copyrights. Defendant has moved to dismiss Plaintiff's complaint in its entirety. Because the use of a goods trademark to protect against copying the tracks raises the spectre of the "species of mutant copyright law" about which the Supreme Court cautioned in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, Plaintiff's Lanham Act claims based on its goods marks are dismissed. The same rationale does not apply to the service mark claims, but Plaintiff has failed to plausibly allege that the copied tracks at issue here are of diminished quality, so its claims based on service marks are also dismissed.

## I.     BACKGROUND

    Karaoke as it is known today is made possible by "karaoke accompaniment tracks," which are re-recorded versions of popular songs without the corresponding vocals and with a

corresponding visual component displaying the lyrics to the songs and visual cues for the performer. Dkt. No. 1, Complaint ("Compl.") ¶ 11. Plaintiff Phoenix Entertainment Partners, LLC's predecessor in interest, Slep-Tone Entertainment Corporation, produced more than 16,500 such tracks "on special compact discs known as CD+G ('compact disc plus graphics') discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ('MP3 plus graphics') on compact discs." *Id.* ¶ 17. These tracks are all branded under the trademark "Sound Choice," a mark for which Plaintiff owns several trademarks and service marks. *Id.* ¶¶ 16-17. According to Plaintiff, Sound Choice-branded karaoke tracks are "wildly popular" and may make up more than half of all karaoke tracks played across the United States. *Id.* ¶ 18. The reason for Sound Choice tracks' popularity, Plaintiff alleges, is that they are "usually the most faithful to the sound of the original recording" and because they provide accurate visual cues during the performances. *Id.* ¶¶ 19-20.

Sound Choice tracks are only released on compact discs, and not through any other format like hard drives or internet downloads. *Id.* ¶ 21. At some point, users of Sound Choice tracks began transferring the tracks from CD+Gs to "alternative media, such as computer hard drives." *Id.* ¶ 22. This process is referred to as "media-shifting" or "format-shifting."[1] *Id.* ¶ 24. According to the complaint, media shifting results in "degraded" and "inferior" copies of the tracks compared to the original tracks on CD+Gs due to the digital compression of the tracks. *Id.* ¶ 23. Plaintiff does not explicitly allege that Defendant media-shifted Sound Choice tracks from CD+Gs to hard drives, but rather alleges that Defendant possesses karaoke accompaniment tracks that are "marked with the Sound Choice Mark and are specifically identified in the computer system that contains them, by name or other symbol, as SOUND CHOICE tracks" and that those tracks "were not made by Phoenix." *Id.* ¶¶ 38-39. As a result, Plaintiff concludes, any karaoke accompaniment tracks that

---

[1] For the sake of clarity, this opinion will refer to this practice as "media shifting."

2

Defendant supplies to their patrons and that were marked with the Sound Choice Marks "were and are counterfeit." *Id.* at ¶ 42. In its opposition brief, Plaintiff clarifies that it intended to allege that Defendant "engaged in a process called 'media shifting' a/k/a 'ripping' because the information is being copied from one medium to another, and 'format-shifting' because the information is being modified from one format to another. . . ." Dkt. No. 24, Mem. of Law in Opp'n to Mot. to Dismiss ("Pl.'s Mem.") at 15.

Plaintiff alleges that consumers will view the display of the Sound Choice mark in connection with karaoke shows "as an indicator of the affiliation, connection, or association of the Defendant with [Plaintiff], or of [Plaintiff's] sponsorship or approval of the services and related commercial activities, rather than merely as indicating [Plaintiff] as the creator of the underlying communicative content of any particular song being performed." Compl. ¶ 45. Similarly, Plaintiff alleges that consumers are "likely to be confused regarding the origin or sponsorship of the goods being supplied and regarding the affiliation or connection of the Defendant with [Plaintiff], based on their mistaken belief that the goods being supplied were made by [Plaintiff] and that the services being provided are provided with [Plaintiff's] knowledge and approval." *Id.* ¶ 47. In sum, Plaintiff alleges that consumers are likely to be confused when media-shifted karaoke accompaniment tracks bearing Sound Choice marks are played at Defendant's karaoke shows.

Many of the unusual elements of Plaintiff's claims in this case may be best understood as trademark claims brought in the absence of a copyright to protect against the unauthorized copying of Plaintiff's karaoke accompaniment tracks. As the Seventh Circuit observed in a nearly identical case brought by the same Plaintiff, "there is no doubt that, on the facts alleged, [Plaintiff] would have a perfectly viable claim for copyright infringement against the defendants, *if* [Plaintiff] owned the copyright on these tracks. We are told it does not. [Plaintiff] *does* own the Sound Choice trademarks and associated trade dress, which explains why [Plaintiff] has cast its lot with trademark rather than copyright law." *Phoenix Entertainment Partners v. Rumsey*, 829 F.3d 817, 824 (7th Cir.

3

2016).² The Seventh Circuit's observations are equally relevant here because all of the conduct to which Plaintiff objects in this case stems from unauthorized copying.

## II. PROCEDURAL HISTORY

On December 7, 2016, Plaintiff brought this action against Defendant J-V Successors, Inc., a corporation that operates a bar and restaurant called Keats Bar in New York City. Compl. ¶ 8. Plaintiff asserts federal claims for trademark infringement and unfair competition under the Lanham Act, and several state law claims. As relief, Plaintiff seeks a permanent injunction barring Defendant from further unauthorized use or copying of Sound Choice tracks, as well as compensatory and punitive damages. *Id.* at 16-17. On February 8, 2017, Defendant moved to dismiss the complaint. Dkt. No. 25, Mot. To Dismiss; Dkt. No. 26, Mem. of Law in Supp. Of Mot. To Dismiss ("Def.'s Mem."). Plaintiff filed an opposition brief on March 1, 2017, Pl.'s Mem., and Defendant filed a reply brief on March 13, 2017, Dkt. No. 27, Reply Mem. of Law in Supp. Of Mot. to Dismiss ("Def.'s Reply Mem.").

## III. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at

---
² The Court notes that Phoenix and its predecessor Slep-Tone have brought more than 150 lawsuits throughout the country under the Lanham Act alleging conduct similar to what Plaintiff alleges here. *See Rumsey*, 829 F.3d at 819.

4

556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

## IV. DISCUSSION

Plaintiff's claims against Defendant arise out of its four federally registered trademarks and service marks. A trademark is "any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods . . . ." 15 U.S.C. § 1127. The two trademarks at issue here are for "[p]re-recorded . . . compact discs containing musical compositions and compact discs containing video related to musical compositions." Compl. at 18. A service mark is "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services." 15 U.S.C. § 1127. The two service marks at issue here are for "[c]onducting entertainment exhibitions in the nature of karaoke shows." Compl. at 18. "Whether a mark is [a trademark] or [a service mark], the standards for determining infringement are essentially the same." *Murphy v. Provident Mut. Life Ins. Co. of Philadelphia*, 923 F.2d 923, 927 (2d Cir. 1990) (citations omitted).

"The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'" *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003) (citing 15 U.S.C. § 1127). The Lanham Act's trademark infringement provision provides that:

> [a]ny person . . . use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."

15 U.S.C. § 1114(1)(a). The Lanham Act's unfair competition provision provides that:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(A).

The infringement analysis under the trademark infringement and unfair competition provisions of the Lanham Act is the same. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009) (citations omitted). To prevail on claims under either provision, "a plaintiff must show (1) that it has a valid mark that is entitled to protection under the Act, and (2) that use of the defendant's mark infringes, or is likely to infringe, the mark of the plaintiff," meaning that use of the mark "creates a likelihood of confusion." *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508-09 (2d Cir. 1997). "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (citing *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 (2d Cir. 1979)).

To determine likelihood of confusion, courts in this Circuit consider the factors established in *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):  (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.  *Starbucks Corp.*, 588 F.3d at 115.  "The application of the Polaroid test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused."  *Id.* (citation omitted).

At the outset, the Court notes that the first element—the marks' validity and entitlement to protection—is not in dispute here.  "A certificate of registration with the [Patent and Trademark Office] is prima facie evidence that the mark is registered and valid (*i.e.*, protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce."  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) (citing 15 U.S.C. § 1115(a)).  All four marks at issue in this case are federally registered, and Defendant does not contest that they are valid and entitled to protection.  The question, then, is whether Plaintiff has adequately pleaded infringement—that Defendant's use of Plaintiff's marks is likely to cause confusion.

**A. The Goods Marks**

Plaintiff cannot plead infringement with respect to its marks for goods because there is no confusion about the source of the relevant goods.  Given the nature of the relevant goods—CD+Gs containing the karaoke accompaniment tracks at issue—this claim cannot survive.

In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, the Supreme Court analyzed the phrase "origin of goods" in the Lanham Act.  539 U.S. 23, 37.  The Court ultimately decided that "origin of goods" means the producer of tangible goods, not the "author of any idea, concept, or

7

communication embodied in those goods." *Id.* at 37-38. The Court reasoned that this conclusion was necessary in part because of the Lanham Act's foundations, "which were *not* designed to protect originality or creativity," and in light of the copyright and patent laws, "which *were.*" *Id.* at 37. Any other interpretation would expand trademark law beyond its intended scope and "create a species of mutant copyright law. . . ." *Id.* at 34.

In *Phoenix Entertainment Partners v. Rumsey*, the Seventh Circuit applied the reasoning of *Dastar* to media-shifting claims brought by Phoenix (and its predecessor Slep-Tone). *See generally* 829 F.3d 817 (7th Cir. 2016). Analyzing claims nearly identical to those at issue here with respect to Plaintiff's goods marks, the Seventh Circuit held that the consumers of karaoke shows could not be confused about the source of the tangible good, as the Supreme Court in *Dastar* interpreted the Lanham Act to require, because consumers are not aware of the tangible good at issue—*i.e.*, the digital files containing karaoke accompaniment tracks. Adopting the Seventh Circuit's approach in *Rumsey*, the Ninth Circuit explained:

> If there is any confusion, it does not concern the source of the goods, as the Lanham Act requires. Consumers never see the digital files and Defendants neither sell them nor make representations about their source medium. Accordingly, Defendants do not use the Sound Choice marks "in connection with the sale, offering for sale, distribution, or advertising" of the files under 15 U.S.C. § 1114(1)(a) or "in connection with" the files under § 1125(a)(1). Instead, Defendants make allegedly unauthorized use of the content of Plaintiff's karaoke tracks, which *Dastar* precludes as a trademark claim. As the Supreme Court explained, "[t]he words of the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers."

*Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 845 F.3d 1246, 1250 (9th Cir. 2017) (quoting *Dastar*, 539 U.S. at 32-33). The Seventh Circuit noted that the conduct at issue in these cases, "[t]he unauthorized copying of a creative work[,] is typically the province of copyright law." *Rumsey*, 829 F.3d at 824 (citations omitted).

In the absence of binding precedent from the Second Circuit on this issue, the Court adopts

the reasoning of the Seventh and Ninth Circuits, which is persuasive. Accordingly, for the reasons described in *Rumsey* and *Wired for Sound*, Defendant's motion to dismiss is granted as to Plaintiff's claims arising out of its goods marks. Plaintiff's claims based on its service marks, however, require a separate analysis.

### B. The Service Marks

As described above, the Lanham Act provides a cause of action for claims relating to the provision of "goods *or services*." 15 U.S.C. §§ 1114 & 1125 (emphasis added). *Dastar* involved goods marks, and focused on the meaning of the phrase "origin of goods." *Rumsey* and *Wired for Sound* likewise involved goods marks,[3] and focused on *Dastar*'s guidance that "origin of goods" means the source of tangible products; in those cases, consumers' lack of awareness of the tangible products at issue was central to the courts' analyses. The phrase "origin of goods" is inapplicable to the service mark claims, because there are no goods or tangible products at issue. Rather, the service of "[c]onducting entertainment exhibitions in the nature of karaoke shows" is the subject of the service mark claims. Accordingly, although the *Rumsey* analysis disposes of Plaintiff's claims based on its goods marks, the Court must review Plaintiff's claims based on its service marks separately.

As discussed above, likelihood of confusion is not limited to confusion about the source of goods or services; "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Star Indus., Inc.*, 412 F.3d at 383 (citing *Dallas Cowboys Cheerleaders, Inc.*, 604 F.2d at 204-05). In assessing likelihood of confusion, the quality of goods or services can be relevant. Indeed, the respective quality of the products is one of the

---

[3] Defendant's assertion that *Rumsey* involved service marks, Def.'s Reply Mem. at 3, is misguided. Though the first complaint asserted service marks, Compl. ¶¶ 40, 42, *Slep-Tone Entm't Corp. v. The Basket Case Pub, Inc.*, 15-cv-1009 (C.D. Ill. Jan. 6, 2015) (Dkt. No. 1), the amended complaint did not, *see* Am. Compl. ¶¶ 42-43, *Slep-Tone Entm't Corp. v. The Basket Case Pub, Inc.*, 15-cv-1009 (C.D. Ill. Jan. 6, 2015) (Dkt. No. 20). Defendant also attempts to cite the district court case associated with *Wired for Sound*, but the case it cites is an unrelated case, albeit one brought by Slep-Tone. *See* Def.'s Reply Mem. at 3. Nonetheless, the district court case that is actually associated with *Wired for Sound* did involve service marks, Second Am. Compl ¶¶ 41-42., *Slep-Tone Entm't Corp. v. McCullar*, 2:12-cv-2631 (D. Ariz. Nov. 1, 2013) (Dkt. No. 66), contrary to Plaintiff's argument that "Phoenix's service marks were *not* at issue in [*Wired for Sound*]," Pl.'s Mem. at 15.

*Polaroid* factors, and "can be relevant in two ways: (1) an inferior product may cause injury to the plaintiff trademark owner because people may think that the senior and junior products came from the same source; or (2) products of equal quality may tend to create confusion as to source because of this very similarity." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 505 (2d Cir. 1996) (citing *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir. 1993)).

Here, Plaintiff alleges that consumers' confusion will arise from the Sound Choice mark being associated with a karaoke accompaniment track that is identical to the original except in quality. But Plaintiff makes only the conclusory allegation that consumers will view the display of the Sound Choice mark in connection with karaoke shows "as an indicator of the affiliation, connection, or association of the Defendant with [Plaintiff], or of [Plaintiff's] sponsorship or approval of the services and related commercial activities, rather than merely as indicating [Plaintiff] as the creator of the underlying communicative content of any particular song being performed." Compl. ¶ 45. Plaintiff only alleges that media-shifted tracks in general are "inferior" and of "substantial[ly] reduc[ed]" quality. *Id.* ¶¶ 23, 25. Critically, however, nowhere does Plaintiff allege anything about the specific quality of the tracks Defendant plays. While recognizing its obligation to draw reasonable inferences in favor of Plaintiff, as the non-moving party, the Court does not believe it reasonable to complete this significant gap in Plaintiff's pleading by inferring that any digital copies used by Defendant are of inferior quality.[4]

Plaintiff also fails to allege any facts to support a quality control claim. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prod. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) (citations omitted). "'Distribution of a product that does not meet the trademark holder's quality control standards . . . is deemed for Lanham Act

---

[4] After all, the conduct that Plaintiff alleges in this case did not take place in 1987 with vinyl records copied to cassette tapes; instead, it took place in 2016 and involved the copying of content from CD+Gs to computer hard drives.

purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement." *L'Oreal USA, Inc. v. Trend Beauty Corp.*, No. 11-cv-4187, 2013 WL 4400532, at *15 (S.D.N.Y. Aug. 15, 2013) (citing *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996)). To state a claim based on failure to meet quality control standards, "[t]he trademark holder must demonstrate only that: (i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark. *Warner-Lambert Co.*, 86 F.3d at 6-7 (citing *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78-79 (2d Cir. 1994); *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 591 (5th Cir. 1993)). "[F]or purposes of analyzing trademark infringement involving interference with quality control procedures, 'the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.'" *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246 (2d Cir. 2009) (citing *El Greco Leather Prod. Co.*, 806 F.2d at 395).

Here, Plaintiff has failed to adequately plead a quality control claim. Plaintiff alleges only that is "has been damaged through . . . the loss of [its] ability to control the quality of goods marked and services provided in connection with the Sound Choice mark." Compl. ¶ 48. Plaintiff does not allege that it has any quality control procedures in the first place, and as a result there are no allegations that it abides by any such procedures.[5] In the absence of an adequate showing of a likelihood of confusion as to Plaintiff's service marks, and in light of Plaintiff's failure to adequately plead a quality control claim, Defendant's motion to dismiss is granted as to the service marks.

---

[5] The Court notes as dicta that while a bar on copying might be an effective quality control procedure, a trademark claim based on a violation of such a policy in this context might well spawn the "species of mutant copyright law" about which the Supreme Court warned in *Dastar*. Indeed, proscribing the unauthorized reproduction of creative content is one of the core purposes of copyright law. *Cf. Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) ("The fundamental copyright principles are clear. The owner of a copyright has the exclusive right to—or to license others to—reproduce . . . his copyrighted work." (citing 17 U.S.C. § 106)). The Court has not explored this issue given the absence of any allegation regarding the implementation of a quality control procedure by Plaintiff.

### C. State Law Claims

Under 28 U.S.C. § 1367(c)(3), supplemental jurisdiction over state law claims is within the Court's discretion if it has "dismissed all claims over which it has original jurisdiction." The Second Circuit counsels *against* exercising supplemental jurisdiction in such a situation: "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees,* 937 F.2d 752, 758 (2d Cir. 1991)).

Having dismissed all of Plaintiff's claims that were based on a federal question under 28 U.S.C. § 1331, and there being no other basis for federal jurisdiction over this case, the Court declines to exercise its supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3).

## V. LEAVE TO AMEND

In this Circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Accordingly, the Court grants Plaintiff leave to amend the complaint to correct the deficiencies identified in this opinion. Any amended complaint must be filed no later than 30 days after the date of this order.

## VI. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is granted. All of Plaintiff's claims against Defendant are dismissed without prejudice. Plaintiff is granted leave to replead its claims no later than 30 days following the date of this order. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 25.

SO ORDERED.

Dated: March 31, 2018
New York, New York

GREGORY H. WOODS
United States District Judge